## IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **United States of America** | : | |
| | : | |
| | : | |
| **v.** | : | **Case No.  1:24-CR-311-ELH** |
| | : | |
| **James Edward Howeth** | : | |
| | : | |
| **Defendant** | : | |

## REPLY TO GOVERNMENT'S OPPOSITION TO MOTIONS TO SUPPRESS AND REQUEST FOR A *FRANKS* HEARING

### Introduction

James Howeth, through undersigned counsel, respectfully submits this Reply to the Government's Consolidated Opposition (ECF No. 59) to Mr. Howeth's (1) Motion to Suppress and Request for a *Franks* Hearing (ECF No. 54), and (2) Motion to Suppress Statements (ECF No. 53).

The Government's response fails to rehabilitate the constitutional defects that plague both the search of Mr. Howeth's residence and the statements obtained thereafter. The warrant to search Mr. Howeth's residence lacked the factual nexus the Fourth Amendment requires, contained material omissions that distorted the magistrate's probable cause assessment, and authorized (and was executed with) a prohibited degree of digital overbreadth. Additionally, the statements at issue were obtained in circumstances that overbore Mr. Howeth's will or constituted the functional equivalent of interrogation. Thus, suppression of all the fruits of the defective warrant and illegal statements is warranted.

1

## I. THE GOVERNMENT HAS NOT ESTABLISHED THE REQUIRED NEXUS BETWEEN THE SUSPECTED CRIMINAL ACTIVITY AND MR. HOWETH'S RESIDENCE.

The Government argues that Sgt. Antal's search warrant affidavit sufficiently established the required nexus between Mr. Howeth's home and the suspected criminal activity through a series of links.  According to the Government, Sgt. Antal: (1) "linked the suspected email address ███ to the uploading of CSAM to an account belonging to Howeth's girlfriend Curl;" (2) "linked Howeth to that email address through ███ records and through Curl's phone; (3) "linked Howeth to the residence"; and (4) "linked the electronic devices to be be [sic] seized to the storing of CSAM, like within an email account." Government's Response at 16.

While the Government's response portrays a series of connections between the initial CSAM that was flagged by the NCMEC Cybertip and Mr. Howeth, it fails to appreciate the particular type of connection required by the Fourth Amendment's nexus component: one that presents "a substantial basis for concluding that probable cause exist[s] to search a particular place for evidence of a suspected crime[.]" *United States v. Jones*, 352 F.3d 153, 158 (4th Cir. 2020); *see also United States v. Lalor*, 996 F.2d 1578, 1583 (4th Cir. 1993) (noting that "residential searches have been upheld only where some information links the criminal activity to the defendant's residence").

If any connection was sufficient, then the Fourth Circuit would have reached a different conclusion in *Lalor* given the unquestionable connection between the defendant and his residence. *See Lalor*, 996 F.2d at 1582-83. But it didn't. That's

because there was **no** evidence connecting the suspected criminal activity (drug activity) with the place to be searched (the defendant's residence), even though the residence was connected to the defendant because that is where he lived. Similarly, if any connection was sufficient to justify a search warrant for a home, then the Fifth Circuit would have also reached the opposite conclusion in *Wilson*. *See United States v. Wilson*, 153 F.4th 478 (5th Cir. 2025). But it didn't. That's because there was no evidence connecting the suspected criminal activity (brandishing a firearm at the Waffle House) with the place to be searched (the apartment where "witnesses have confirmed seeing" the defendant). *Id.* at 485.

Additionally, the series of links relied upon by the Government are based on a reimagination of Sgt. Antal's investigation, the inferences drawn from it, and the facts presented in support of the search warrant for Mr. Howeth's residence. For example, the Government's first link claims to be that the ▮▮▮▮ email was connected to the "uploading of CSAM to an account belonging to [Ann Curl]." Government's Response at 16. While that email was identified in the NCMEC Cybertip, the subsequent investigation determined that the upload came from Ann Curl's phone. Indeed, on four separate occasions Sgt. Antal submitted search warrant affidavits for the Synchronoss account and Ann Curl's cell phone identifying her cell phone (and only her cell phone) as the source of the CSAM flagged by the NCMEC Cybertip.

In the first search warrant affidavit, Sgt. Antal wrote: ***Synchronoss Technologies, Inc provided a phone number,*** ▮▮▮▮▮▮▮▮ ***, for the use of the***

*upload*. The telephone number comes back to Verizon Wireless as the service provider. A subpoena was issued to Verizon to better identify the target. Ex. C (ECF No. 66) at ¶ 3 (emphasis added).

In the second search warrant affidavit, Sgt. Antal wrote: On September 15, 2023 at 21:06:11 UTC, *an image was uploaded to Verizon Synchronoss Technologies account utilizing the phone number* ███████ one image depicting suspected Child Sexual Abuse Material (CSAM) was uploaded to a Synchronoss Technologies, Inc. account with the phone number ███████. Ex. F (ECF No. 69) (emphasis added).

In the third search warrant affidavit, Sgt. Antal wrote: On September 15, 2023 at 21:06:11 UTC, *an image was uploaded to Verizon Synchronoss Technologies account utilizing the phone number* ███████ one image depicting suspected Child Sexual Abuse Material (CSAM) was uploaded to a Synchronoss Technologies, Inc. account with the phone number ███████. Ex. G (ECF No. 70) (emphasis added).

In the fourth search warrant affidavit, Sgt. Antal wrote: On September 15, 2023 at 21:06:11 UTC, *an image was uploaded to Verizon Synchronoss Technologies account utilizing the phone number* ███████ one image depicting suspected Child Sexual Abuse Material (CSAM) was uploaded to a Synchronoss Technologies, Inc. account with the phone number ███████. Ex. H (ECF No. 71) (emphasis added).

If there is any question about who caused the CSAM to be uploaded to the Synchronoss cloud, or where it originated, Sgt. Antal tells us so himself. During the interview with Ann Curl, Sgt. Antal advised: "So one of the photos that you viewed on your phone was flagged and got saved to your cloud and that was sent to us." Ex. B (ECF No. 47, 75) at 4:28 – 4:36.

It was not until Sgt. Antal submitted a search warrant affidavit for Mr. Howeth's residence that he identified the ███ email. *See* Ex. I (ECF No. 72). Importantly, the search warrant affidavit appears to claim that the email was discovered during a forensic examination of Ann Curl's cell phone. *See* Ex. I (ECF No. 72); *see also* Government's Response at 7 ("Investigators were able to locate the ███ email address within the device and determined that it was associated with Howeth, a contact within the device."). Sgt. Antal presented no facts about how or where the email was located within Ann Curl's cell phone, and no facts to suggest Mr. Howeth had access to or control of Ann Curl's cell phone. Thus, that agents found the email associated with the NCMEC Cybertip within the cell phone that investigators believe was the source of the CSAM further dispels any potential suspicion that evidence of criminal activity would be found at Mr. Howeth's residence. Both the email and phone number associated with the NCMEC Cybertip were found in the sole and exclusive control of Ann Curl and in her cell phone, nowhere at or near Mr. Howeth's residence.

Ann Curl's cell phone was assigned the number directly connected to the uploading of the CSAM to her Synchronoss account. And within her cell phone,

agents claim to have found the email also associated with the NCMEC Cybertip. The search warrant affidavit presents no facts to support finding that the email found within Ann Curl's cell phone raises a fair probability that evidence of child pornography-related offenses will be found inside of Mr. Howeth's residence – a place where Ann Curl does not live.

The Supreme Court has held that probable cause to search a home requires facts indicating that evidence "will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). In the Fourth Circuit, residential searches have been upheld "only where some information links the criminal activity to the defendant's residence." *United States v. Lalor,* 996 F2d 1578, 1583 (4th Cir. 1993). In *United States v. Doyle*, the Fourth Circuit reversed the denial of a suppression motion because the warrant application provided only "scant indication" that illicit images were connected to the home. 650 F.3d 460, 463–64 (4th Cir. 2011) (finding lack of nexus where allegations of sexual misconduct did not indicate CSAM would be located in the residence). The affidavit here is weaker than the deficient one in *Doyle*. There, the affidavit at least alleged the defendant personally displayed images to children; here, Sgt. Antal alleged no facts to suggest that any person engaged in any child pornography related offenses at Mr. Howeth's residence.

The Government attempts to distinguish this case by arguing that, unlike search warrant affidavit in *Doyle*, the affidavit in this case "provided a date of when the CSAM file was uploaded" to the Synchronoss account. Government's Response at 15. While Sgt. Antal's search warrant affidavit provides a date associated with

the CSAM upload, there are no facts to suggest that it originated from conduct that took place at or near Mr. Howeth's residence. To the contrary, the NCMEC Cybertip provided a residential address to Sgt. Antal that was directly associated with the CSAM uploaded to the Synchronoss account: Ann Curl's residence. Sgt. Antal did not apply for a search warrant for her home and omitted that information from the affidavit in support of a search warrant for Mr. Howeth's home.

The Government's attempt to distinguish *Lalor* is similarly unpersuasive. It argues that in *Lalor* involved a "wholly different type of crime," and there "the court found that there was no information linking the criminal activity of drug distribution" to Lalor's home. Government's Response at 15. But here, there is no information linking the suspected criminal activity to Mr. Howeth's residence. The affidavit never asserts that the adult male depicted in the Cybertip image was identifiable—much less that he resembled or was linked to Mr. Howeth. The affidavit never asserts that the two images located in Ann Curl's cell phone (depicting an unknown person in what appears to be in a child's bedroom in a skirt and nude from the waste up) were taken at Mr. Howeth's residence, involved Mr. Howeth, or involved anyone that lives at Mr. Howeth's residence.

The affidavit also fails to identify when, how, or from where Mr. Howeth allegedly accessed the ██████ email account. Importantly, it does not state whether the ████ email was accessed from devices located at or near Mr. Howeth's residence. The affidavit does not identify any IP address, device location, Wi-Fi network, or any metadata connecting the NCMEC Cybertip with Mr. Howeth's

residence. Without temporal, geographic, or device-specific context, the mere fact that an email address has once been associated with a person cannot support a fair probability that evidence would be found in that person's home. The Fourth Circuit has been clear: the "critical element" is not suspicion of the person but whether evidence is likely to be found where police seek entry. *Doyle*, 650 F.3d at 467 (emphasis added). The Government has not identified a single fact on which a magistrate could reasonably rely to conclude that evidence of the suspected criminal activity was likely at Mr. Howeth's residence.

Finally, the Government attempts to distinguish *Wilson* by arguing that there, the affiant "did not provide any observations, inference, or corroborated tips to link the assault (which occurred at a Waffle House) with the residence, including no mention of any factual confirmation that Wilson lived in the residence they sought to search in the first place." Government's Response at 15-16. Much like *Wilson*, however, there is no information to link the CSAM uploaded by Ann Curl using her cell phone with Mr. Howeth's residence. But even the deficient affidavit in *Wilson* had more information tying the suspect with the residence in question. There, the affidavit said that "witnesses have confirmed seeing *Wilson* at the residence." 153 F.4th at 482. Here, the affidavit presents no facts to establish that Ann Curl resides or was observed at or near Mr. Howeth's residence.

Under the totality of circumstances, this search warrant affidavit resembles those that federal courts have repeatedly found deficient for failing to establish the required nexus. *See Lalor*, 996 F.2d at 1583; *Wilson* 153 F.th at 489. Because the

affidavit fails to establish the required nexus between the suspected criminal activity and Mr. Howeth's residence, it fails to establish probable cause to search his home. As a result, the search violated the Fourth Amendment.

## II.    MR. HOWETH HAS MADE A SUBSTANTIAL PRELIMINARY SHOWING TO WARRANT A *FRANKS* HEARING.

Mr. Howeth bring a *Franks* motion based on two material omissions in Sgt. Antal's search warrant affidavit. First, Sgt. Antal omitted that, based on his investigation, the CSAM image in question was uploaded to Ann Curl's Synchronoss account because she viewed the image on her phone. *See* Motion to Suppress and Request for a Franks Hearing at 24. Second, Sgt. Antal omitted Ann Curl's residential address despite knowing that it was different from Mr. Howeth's residence. *See id*. at 24 – 26.

In its response the Government does not assert that Sgt. Antal included this information, thus appearing to concede the first prong of the *Franks* analysis (*i.e.*, that Sgt. Antal omitted information from the search warrant affidavit). At issue appears to be the second and third prong of the analysis. That is, whether the omitted information is material, and whether it was omitted intentionally, or with reckless disregard about whether it would mislead. Mr. Howeth has made a substantial preliminary showing of both prongs.

The Government first argues that it "[i]t was immaterial whether Curl resided at Howeth's residence or had her own separate residence." Government's Response at 17. According to the Government, that is because "[t]he connection being sought is that email ███████ uploaded a CSAM file that ended up on a Syncronoss cloud storage

account and determining were that file, and likely other CSAM files like it, were stored." *Id*. The Government's position is at odds with the requirements of the Fourth Amendment and the facts of this case.

First, when seeking a search warrant for a residence, the Fourth Circuit has upheld those warrants "only where some information links the criminal activity to the defendant's residence." *Lalor*, 996 F.2d at 1583. Ann Curl was suspected of engaging in the child pornography-related offenses. That is precisely why Sgt. Antal authored ***4 separate search warrants*** for her Synchronoss account and cell phone. Sgt. Antal presented no facts to establish that Mr. Howeth possessed, had access to, or used Ann Curl's cell phone, or that Ann Curl resided or was observed at Mr. Howeth's residence. Sgt. Antal presented no facts to establish that the CSAM uploaded originated from conduct that took place at Mr. Howeth's residence, or that it came from any device found at his residence.

It is precisely because there are no facts connecting any suspected criminal activity to Mr. Howeth's residence that make the omission of Ann Curl's residence material in this case. Her residential address was explicitly identified in the NCMEC Cybertip report, and in a photocopy of the driver's license found in her Synchronoss account – two critical pieces of evidence Sgt. Antal reviewed and relied upon in seeking search warrants in this case. If Ann Curl resided at Mr. Howeth's residence, that would be one of the premier facts that the Government would rely upon to support the search of the home. The reason is obvious: evidence and law enforcement

investigation found that she was engaged in the suspected criminal activity that prompted this entire investigation.

But instead of providing the magistrate judge with information about where Ann Curl resided, Sgt. Antal wrote that she and Mr. Howeth were in a relationship and that she was listed as an emergency contact on ██████ records. As the Government concedes, this information serves "as a further tie to the closeness of their relationship." Government's Response at 17. The reason Sgt. Antal wanted to frame the facts in a way that highlights the "closeness of their relationship," was to build a connection between the individual primarily suspected of engaging in criminal activity (Ann Curl) and Mr. Howeth. That is because there were no independent facts to raise a fair probability that evidence of the suspected criminal activity would be found at Mr. Howeth's residence. Omitting Ann Curl's residential address information left open the possibility that the magistrate judge would be led to believe that she (along with her cellphone) resided with Mr. Howeth. Disclosing the information would eliminate that connection, and no reasonable magistrate would find a fair probability that evidence of the suspected criminal activity would be found in Mr. Howeth's residence.

The Government asserts that Mr. Howeth "seems to argue that Curl was the only suspect, when there was a reasonable conclusion to be made that Howeth was also a suspect." Government's Response at 18. Again, the Government fails to appreciate the critical distinction between being suspected of criminal activity and having probable cause to search a residence. The Fourth Circuit has made clear "[i]n

determining whether a search warrant is supported by probable cause, ***the crucial element is not whether the target of the search is suspected of a crime***, but whether it was reasonable to believe that the items to be seized will be found in the place to be searched." *Lalor*, 996 F.2d at 1582 (emphasis added). Even if there is probable cause to believe that person has committed a crime, it "does not automatically give the police probable cause to search his house for evidence of that crime." *Wilson*, 153 F.4th at 485 (quoting *United States v. Freeman*, 685 F.2d 942, 949 (5th Cir. 1982)). That's because:

> One concerns the person; the other concerns the place. And the Constitution demands a factual bridge between the two. 'Freedom in one's own dwelling is the archetype of the privacy protection secured by the Fourth Amendment.' Consistent with the 'centuries-old principle' that the 'home is entitled to special protection,' we have deemed affidavits bare bones when they 'provided no information linking the [criminal] investigation to [the defendant's] residence…

*Wilson*, 153 F.4th at 485-86 (internal footnotes and citations omitted).

Thus, even if Sgt. Antal suspected Mr. Howeth of engaging in criminal activity (and Sgt. Antal's investigation makes clear that Ann Curl was suspected to the source of the child pornography uploaded to Synchronoss), he presented no facts to establish probable cause to believe that evidence of that criminal activity would be found in Mr. Howeth's home. *See Wilson*, 153 F.4th at 468 (finding search warrant affidavit to be bare bones where it "alleged no suspicious activity at or near [the target residence]. And its lone, unexplained assertion that officers 'believed' contraband was 'located at [the target residence] is far too thin to make probable cause reasonable."). Because

the omitted information would have defeated probable cause, Mr. Howeth has made a substantial preliminary showing as to the third prong of the *Franks* analysis.

The Government also argues that "there is no evidence that Sgt. Antal had the requisite intent to mislead or that he exhibited a flagrant police action." Government's Response at 18. One way of establishing the requisite intent in this case is by proffering "evidence that a police officer 'failed to inform the judicial officer of facts [he] knew would negate probable cause.' " *United States v. Lull*, 824 F.3d 109, 117 (4th Cir. 2016) (quoting *Miller v. Prince George's County, MD*, 475 F.3d 621, 627 (4th Cir. 2007) (alteration in original) (citations omitted)). In those instances, "[t]he relevance of the omission comes into play: the significance – or insignificance – of a particular omission to the determination of probable cause may inform our conclusion regarding the agent's intent." *Lull*, 824 F.3d at 117.

Here, there is no dispute that Sgt. Antal reviewed the NCMEC Cybertip and learned that Ann Curl's residential information was identified in it. There is no dispute that Sgt. Antal executed a search warrant on Ann Curl's Synchronoss account and found a photocopy of her driver's license that included her residential address information, along with (1) a picture depicting a brown and black dog performing oral sex on a human female; (2) a picture depicting a brown and black dog sitting a vehicle with Ann Curl; and (3) a 41-second video depicting a brown and black dog being ordered and performing oral sex on a human female. *See* Ex. D (ECF No. 67). And there is no dispute that Sgt. Antal reviewed the ███ records which also reflected Ann Curl's residential information. Sg. Antal was fully aware that Ann Curl's

residence was **not** the same as Mr. Howeth's residence. By the time Sgt. Antal submitted the search warrant affidavit for Mr. Howeth's residence, he had authored and executed multiple search warrants on Ann Curl's cell phone. All of the suspected criminal activity was tied to Ann Curl and her cell phone. There were no facts to establish that any suspected criminal activity took place at or near Mr. Howeth's residence.

Given the importance Ann Curl and her activities were to the heart of the investigation and suspected criminal activity, where she lived was important. That is particularly true where, as here, the agents had moved on from searching her cell phone to searching a residence. But she did not live at the residence that was the target of the search warrant in this case, and there are no facts presented in the search warrant to suggest that she was observed at the residence at all. Sgt. Antal's decision to write that Ann Curl was in a relationship with Mr. Howeth and was listed as an emergency contact in the ███████ records demonstrates Sgt. Antal's intent to build a connection between Ann Curl and Mr. Howeth's residence.  Omitting her residential address information – information that was found on critical pieces of evidence he reviewed and relied upon in submitting search warrant affidavits – is a significant fact and incredibly relevant to whether there was probable cause to search the target residence. At a bare minimum, it was done with reckless disregard to whether it would mislead the magistrate judge to believe that Ann Curl resided with Mr. Howeth at the target residence. As such, the Court can rely on these

circumstances to find that Mr. Howeth has made a substantial preliminary showing as to the second prong of the *Franks* analysis.

### III.    OFFICERS EXECUTED A GENERAL DIGITAL SEARCH BY ILLEGALLY PREVIEWING DEVICES ON SCENE.

The Government concedes that, during execution of the search warrant "members of the investigative team conducted on-scene forensics and previewed the devices before seizing them." Government's Response at 18. It argues, however, that the search warrant "was confined to searching for evidence and fruits of the crime of Possession of Child Pornography – even in conducting 'previews' of the devices, law enforcement was bound by that parameter." *Id.* at 19. The scope and nature of these forensic searches were anything but confined.

In challenging whether the search warrant complies with the Fourth Amendment's particularity requirement, the issue relates to the scope of nature of the search. *See United States v. Oloyede*, 982 F.2d 133, 138 (4th Cir. 1992) (noting that the particularity requirement "ensures that the search is confined in scope to particularly described evidence relating to the specific crime for which there is probable cause"). After all, the purposes of the particularity requirement is to ensure that the "search will be carefully tailored to its justification and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit." *Maryland v. Garrison*, 480 U.S. 79, 84 (1987). As highlighted in Mr. Howeth's motion, the search warrant does not define what it means to "preview" or "analyze" an electronic device, nor does it place any limits in the scope, methodology, or use of any forensic tools to accomplish these searches. And the Government offers nothing to

clarify any such limits. *See* Government's Response at 18 – 20. As a result, the search warrant provided investigators with unfettered discretion to forensically search the electronic devices with no limits. Such a warrant violates the particularity requirement of the Fourth Amendment, rendering the search unconstitutional. *See Groh v. Ramirez*, 540 U.S. 551, 559 (2004).

The Government's attempt to invoke the inevitable discovery fails. *See* Government's Response at 20. The inevitable discovery doctrine "demands that the prosecution prove by a preponderance of the evidence: first, that police legally *could* have uncovered the evidence; and second, that police *would* have done so." *United States v. Alston*, 941 F.3d 132, 138 (4th Cir. 2019) (emphasis in original) (citing *United States v. Allen*, 159 F.3d 832, 840 (4th Cir. 1998)). While the Government correctly points out that Sgt. Antal sought and received a search warrant for the electronic devices after they were searched, the inevitable discovery inquiry focuses not on what did happen, but what "could" and "would have" happened, prior to the unconstitutional search. *See Alston*, 941 F.3d at 138 (" 'A finding of inevitable discovery necessarily rests on facts that did not occur,' but 'by definition the occurrence of these facts must have been likely, indeed 'inevitable,' absent the government's misconduct.' ") (quoting *Allen*, 159 F.3d at 840).

The Government has failed to show that, prior to the execution of the search warrant for Mr. Howeth's residence and electronic devices, Sgt. Antal could have or would have obtained a search warrant for the electronic devices. First, Sgt. Antal had no idea what, if any, electronic devices may have been the subject of a subsequent

search warrant. No specific devices were identified in the search warrant for Mr. Howeth's residence. *See* Ex. I (ECF No. 72)

Second, the search warrant that Sgt. Antal obtained for the electronic devices was based on information obtained from the search of Mr. Howeth's home, Mr. Howeth's interrogation, and information pulled directly from the search of the electronic devices. *See* Ex. J (ECF No. 73) ("Your Affiant previewed James Howeth's cellular device during the execution of the search warrant revealed ███████████ ██████████████████████████████████████████). Such information was not available to Sgt. Antal prior to the execution of the search warrant for Mr. Howeth's home. *See United States v. Thomas*, 955 F.2d 207, 211 (4th Cir. 1992) (agreeing that "the fact making discovery inevitable must 'arise from circumstances other than those disclosed by the illegal search itself.' ").

Third, as noted above, there was no probable cause to search Mr. Howeth's home in the first place, let alone electronic devices that law enforcement was unaware of. That a judge found probable cause to issue the search warrant for Mr. Howeth's residence does not, by itself, satisfy the Government's burden of proof on this issue. As noted by the Fourth Circuit, "[t]he inevitable discovery doctrine cannot rescue evidence obtained via an unlawful search simply because probable cause existed to obtain a warrant when the government presents no evidence that the police would have obtained a warrant. Any other rule would emasculate the Fourth Amendment." *Allen*, 159 F.3d at 842.

Finally, while not explicitly raised by the Government, the independent source doctrine also does not save the unconstitutional search at issue. "The independent source doctrine allows for the admission of evidence that was first observed or acquired unlawfully, but later acquired through an independent, lawful source." *United States v. Smith*, 575 F. Supp. 3d 542, 557 (E.D. Pa. 2021) (citing *Murray v. United States*, 487 U.S. 533, 537-38 (1988)). But this doctrine applies only if the government proves that the subsequent lawful source (like a subsequently obtained search warrant) was "truly . . . independent" of the illegal search. *United States v. Siciliano*, 578 F.3d 61, 68 (1st Cir. 2009) (citation omitted); *see also United States v. Dice*, 200 F.3d 978, 984 (6th Cir. 2000) ("To be admissible, the government must show that the evidence was discovered through sources wholly independent of any constitutional violation." (citations and quotation marks omitted)). The Government cannot meet this burden "[1] if the agents' decision to seek the warrant was prompted by what they had seen during the initial entry, or [2] or if information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant." *Murray*, 487 U.S. at 542. If either one of these is true—i.e., the subsequent warrant application was prompted by the illegal search or information illegally obtained influenced the decision to issue a warrant—then the so-called independent source doctrine does not apply. *See United States v. Hill*, 776 F.3d 243, 251-52 (4th Cir. 2015) (holding district court erred in applying the independent source doctrine where "[t]he district court found that the magistrate judge would have issued the warrant absent the evidence from the illegal searches, but did not consider Murray's

first prong that speaks to the officer's decision to seek it"); *Smith*, 575 F. Supp. 3d at 557 (declining to apply independent source doctrine where, even though the court believed the magistrate would have still issued the search warrant absent the unlawful actions of the police, because the decision secure a warrant was "'prompted' by the evidence acquired during the initial unlawful search").

The Government cannot meet its burden because neither of the precursors required to satisfy the independent source doctrine apply. Substantial evidence indicates that the decision to seek the search warrant for the electronic devices was prompted by what law enforcement discovered pursuant to the execution of the search warrant for Mr. Howeth's residence, including the search of the electronic devices. And the Government cannot show that the inclusion of information from the unlawful search did not affect the judge's decision to issue the second search warrant.

Under the inevitable discovery doctrine, the question is whether Sgt. Antal "could have" uncovered the evidence derived from the unconstitutional search of the electronic devices, and whether he "would have" done so prior to the unconstitutional search. He did not obtain a warrant for those electronic devices prior to the unconstitutional search, and the Government has failed to establish that he could have or would have done so. For those reasons, the inevitable discovery doctrine does not apply.

## IV.    THE GOOD-FAITH EXCEPTION DOES NOT APPLY.

Finally, the Government invokes *United States v. Leon*, 468 U.S. 897 (1984), to argue that the officers acted in good faith. *See* Government's Response at 20. Under

*Leon*, evidence "obtained in objectively reasonable reliance on a subsequently invalidated search warrant' " is not subject to the exclusionary rule unless (1) the magistrate issuing the warrant "was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth"; (2) the magistrate issuing the warrant "wholly abandoned his judicial role" and functioned as a rubber stamp for law enforcement; (3) the warrant is "based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; or (4) the warrant is "facially deficient – i.e., in failing to particularize the place to be searched or the things to be seized", such that the executing officer cannot reasonably presume it to be valid. *United States v. Brendann*, 2024 WL 2155235, at *1 (D. Md. May 13, 2024) (quoting *Leon*, 468 U.S. at 922-23 (citations and quotations omitted)).

In this case, the good faith exception does not apply for two independent reasons. First, the search warrant affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Id.* at 923. As noted above, the search warrant affidavit fails to establish the required nexus between Mr. Howeth's home and the suspected criminal activity. Much like the affidavit in *Wilson*, the affidavit in this case is "bare-bones" and "so bereft of any factual connection to the place to be searched – that it was unreasonable for officers to believe probable cause existed." 153 F.4th at 484.

Second, "[a] warrant that violates *Franks* is not subject to the good-faith exception to the exclusionary rule[.]" *United States v. Colkley*, 899 F.2d 297, 300 (4th

Cir. 1990). As noted above, Sgt. Antal submitted a search warrant affidavit that omitted material facts, either intentionally or with reckless disregard for the truth. As a result, Mr. Howeth has shown a *Franks* violation, and the Government is precluded from relying on the good-faith exception.

For these reasons, all tangible and physical evidence stemming from the execution of the search warrant for Mr. Howeth's home must be suppressed.

## V. THE STATEMENTS OBTAINED FROM MR. HOWETH MUST BE SUPPRESSED.

### A. The March 14 Statement and *Miranda* Waiver Were Involuntary Under the Totality of Circumstances.

The Government argues that the March 14 conversation was "cordial" and therefore voluntary. But voluntariness is measured by the totality of circumstances, including the environment in which interrogation occurs and the suspect's vulnerability. *United States v. Cristobal*, 293 F.3d 134, 139–40 (4th Cir. 2002) (evaluating suspect's medical condition, environment, and officers' conduct). The coercive environment present here bears no resemblance to the settings deemed non-coercive in the Government's cases. In *Cristobal*, the defendant, despite being hospitalized with a gunshot wound and receiving narcotic medication, was found capable of voluntary waiver *only* after the Fourth Circuit carefully evaluated whether officers exploited his condition and concluded they had not. *Id.* at 136–37, 140–41. In stark contrast, Mr. Howeth was awakened by a pre-dawn raid, confronted by armed officers, isolated in a police vehicle where he was outnumbered and flanked, and questioned within minutes of this disorienting sequence. Far from the controlled

clinical environment in *Cristobal*, the circumstances here embody the kind of coercive setting that weighs heavily against voluntariness under the Fourth Circuit's totality-of-circumstances analysis.

Moreover, the Government does not meaningfully address the validity of the *Miranda* waiver itself. The Fourth Circuit has repeatedly held that the government must establish, by a preponderance of the evidence, that a waiver was made knowingly, intelligently, and voluntarily under the totality of the circumstances. *See Cristobal*, 293 F.3d 134, 139–40 (4th Cir. 2002). A signed form is not dispositive. Nor does the fact that Mr. Howeth initialed each right or verbally indicated that he "understood" them resolve the inquiry. *See Miranda v. Arizona, 384 U.S. 436, 492* (finding that the fact the accused signed a statement which contained a typed-in clause stating that he had 'full knowledge' of his 'legal rights' does not approach the knowing and intelligent waiver required to relinquish constitutional rights). The question under the Fourth Circuit's totality analysis is not whether boxes were checked, but whether the suspect had a meaningful opportunity to understand and exercise those rights in light of the surrounding coercive circumstances. Here, the circumstances surrounding the purported waiver fatally undermine its validity. Mr. Howeth had been awakened by a pre-dawn raid, confronted by armed officers, separated from his family, and placed in a police vehicle where he was surrounded and questioned mere minutes after being removed from bed. These conditions created disorientation and shock, depriving him of a realistic opportunity to process or exercise his rights. Furthermore, *Braxton,* 112 F.3d at 780–81, underscores why the

Government cannot meet its burden. The critical inquiry is whether the Mr. Howeth's will was overborne, not whether the interaction became "cordial" after police control had been firmly established. In *Braxton*, the Fourth Circuit held a confession voluntary where officers engaged the Mr. Braxton in a low-pressure, conversational encounter inside his mother's home, without force, weapons, or isolation. *Id.* Nothing about the circumstances here approximates that environment. Instead, the officers' show of authority, the timing of the raid, and the rapid transition to custodial questioning reflect a coercive context in which any assertion that Mr. Howeth's waiver was knowing and voluntary becomes untenable. Given the inherently coercive environment in which the waiver was obtained, the Government has not met its burden to show that Mr. Howeth knowingly and voluntarily relinquished his rights.

### B. The October 8 Statement Was the Functional Equivalent of Interrogation Under *Innis*.

*Miranda* applies not only to express questioning but also to "words or actions… that the police should know are reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). The government asserts that agents merely read from a warrant and did not interrogate the defendant. But the record shows that agents described in graphic detail the sexually explicit nature of the alleged images, told Mr. Howeth that photographs of his genitals would be taken, and explained how those photographs would be compared to alleged contraband.

This is not neutral information. It is accusatory, personalized, and plainly likely to provoke an incriminating reaction. And it did: according to the agents, Mr.

Howeth immediately responded that photos on his phone "have the exact same thing." Under *Innis*, this is the functional equivalent of interrogation. The government's reliance on cases like *United States v. Payne* is misplaced, as *Payne* involved neutral notifications of charges, not graphic descriptions of alleged criminal evidence like in this case. *See United States v. Payne*, 954 F.2d 199, 202–03 (4th Cir. 1992). In *Payne*, the Fourth Circuit held that an officer's remark informing a suspect of the evidence against him "was not one that sought or required a response" and therefore did not constitute interrogation. The court emphasized that the officer's comment was a neutral advisement of the investigation's status and was not reasonably likely to elicit an incriminating statement. *Id*. at 201–03.

The interaction here could not be more different. Agents did not merely notify Mr. Howeth of the evidence. They described sexually explicit images in detail, explained that they would photograph his genitals, and conveyed that those photographs would be compared to the alleged contraband. Unlike the neutral advisement in *Payne*, such accusatory and personalized descriptions were inherently likely to provoke an incriminating response. Thus, the October 8 statement must be suppressed.

### C. The October 8 Statement Was Obtained in Violation of Mr. Howeth's Sixth Amendment Right to Counsel.

The Government also fails to address an independent and dispositive basis for suppressing the October 8 statement: the violation of Mr. Howeth's Sixth Amendment right to counsel. By October 8, formal charges had already been filed in the Maryland state case and counsel had entered an appearance on Mr. Howeth's behalf. *See* Def.

Ex B. The right to counsel had therefore attached, and any deliberate elicitation of information in the absence of counsel, or a valid waiver obtained outside counsel's presence, violated the Sixth Amendment. Indeed, in the agent's very own words Mr. Howeth was only informed of his right to have counsel present after allegedly making a statement in direct response to the agents' words and actions. *See* Def. Ex. D (ECF No. 64). The Government's omission of this issue from its opposition effectively concedes the point. Because the Government offers no justification for interrogating a person on charged conduct without counsel present, the October 8 statement must be suppressed on this ground as well.

## CONCLUSION

For the reasons set forth above and in Mr. Howeth's opening submissions, the Government has not carried its burden to justify the intrusion into his home, illegal previewing of his phone, or the use of his statements. The warrant rested on speculation rather than a factual nexus, and the affiant's material omissions prevented the magistrate from conducting the neutral and detached assessment the Fourth Amendment requires. The officers' execution of the warrant departed from the particularity and procedural safeguards demanded in digital search contexts, and both of the statements at issue were obtained in circumstances incompatible with the Fifth Amendment's protections.

Because the Government's opposition fails to rehabilitate these constitutional deficiencies, suppression is the appropriate remedy. The Court should therefore

suppress the evidence seized from Mr. Howeth's residence, suppress both statements,

and grant a hearing under *Franks* to address the affiant's omissions

Respectfully submitted,
James Wyda
Federal Public Defender
  for the District of Maryland

___/s/_____
Francisco A. Carriedo (#816158)
Marquise Findley-Smith
Assistant Federal Public Defender
100 South Charles Street
Tower II, 9th Floor
Baltimore, Maryland  21201
Phone: (410) 962-3962
Fax:  (410) 962-0872
Email: Francisco_Carriedo@fd.org
  Marquise_Findley-Smith@fd.org

## CERTIFICATE OF SERVICE

I hereby certify that on December 11, 2025, a copy of the foregoing was served via CM/ECF to the Government.

_____/s/_____
Francisco A. Carriedo